**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

In re:                              ) BAP No. OR-11-1005-PaJuCl
                                    )        OR-11-1085-PaJuCl
MARY C. BENAFEL,                    )     (consolidated appeals)
                                    )
                Debtor.             ) Bk. No. 10-61542
_____ )
                                    )
MARY C. BENAFEL,                    )
                                    )
                Appellant,          )
                                    )
v.                                  ) **O P I N I O N**
                                    )
ONE WEST BANK, FSB; FRED LONG,      )
Trustee,                            )
                                    )
                Appellees.          )
_____ )


Argued and Submitted on October 20, 2011
at Portland, Oregon

Filed - December 9, 2011

Appeal from the United States Bankruptcy Court
for the District of Oregon

Hon. Frank R. Alley, III, Chief U.S. Bankruptcy Judge, Presiding

_____

Appearances:    Judson M. Carusone argued for Appellant Mary C.
                Benafel.  Joshua Schaer argued for Appellee One
                West Bank, FSB.


Before: PAPPAS, JURY and CLARKSON,[1] Bankruptcy Judges.

_____

[1] The Honorable Scott C. Clarkson, United States Bankruptcy
Judge for the Central District of California, sitting by
designation.

PAPPAS, Bankruptcy Judge:

Appellant, chapter 13[2] debtor Mary C. Benafel ("Benafel"), appeals the bankruptcy court's orders denying confirmation of her original plan on December 22, 2010, and confirming her amended plan on February 11, 2011. Because the bankruptcy court erred in ruling that the date for determining whether real property is a debtor's principal residence for purposes of § 1322(b)(2) is the loan transaction date, not the petition date, we REVERSE and REMAND for further proceedings consistent with this Opinion.

**FACTS**

The material facts in this case are undisputed.

In 1996, Benafel purchased a house in Springfield, Oregon (the "Property") which she occupied as her principal residence. On June 22, 2007, Benafel refinanced the existing loan on the Property with a new loan in the amount of $301,500. The new loan was evidenced by a Promissory Note (the "Note") and secured by a Deed of Trust on the Property in favor of American Mortgage Network, Inc. The Note provided:

> Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy[.]

Appellee One West Bank, FSB ("One West") thereafter succeeded to the lender's interest under the Note and Deed of Trust.

Approximately two years later, in July 2009, Benafel's mother

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

-2-

suffered a stroke. Benafel gave up her employment and assumed full-time care giver responsibilities for her mother. In her words, Benafel assisted her mother on a "24/7 around the clock" basis at her mother's residence. As a result, from July through at least the end of 2009, Benafel was absent from the Property for extended periods of time.

Benafel contacted One West in July 2009, to inform the lender that she would have difficulties meeting her mortgage payments because she was no longer employed. One West's agent inspected the Property several times and reported that the Property had been abandoned. When discussions between Benafel and One West produced no solution to her mortgage payment problems, Benafel defaulted and, in October 2009, One West served Benafel with a notice of a nonjudicial foreclosure. After several delays, a foreclosure sale was set for March 25, 2010.

Attempting to avoid foreclosure, Benafel sought a renter for the Property. Sometime in March 2010, Benafel leased the Property to another person, who moved into the Property.

Benafel filed a chapter 13 petition on March 24, 2010, the day before the scheduled foreclosure sale on the Property. On April 12, 2010, she filed a proposed chapter 13 plan (the "Original Plan"). The Original Plan provided that she would make payments to the trustee of $3,065 per month for sixty months. Of that total, Benafel proposed to pay $2,735 per month to One West in full satisfaction of its allowed secured claim for the debt secured by the Property. Benafel based that payment amount on what she alleged was the current value of the Property of $148,500. Benafel suggested that One West had waived its right to

full payment of the loan under § 1322(b)(2) because of the Note provision that required Benafel to reside at the Property for only one year. The Original Plan also provided for payment of a one percent distribution on claims of unsecured creditors, including the unsecured portion of the One West loan.

One West objected to confirmation of the Original Plan on April 20, 2010; it submitted a memorandum of points and authorities supporting its objection on November 6, 2010. In its memorandum, One West pointed out that through the Original Plan, Benafel was attempting to "cram down" its secured claim in violation of § 1322(b)(2)'s prohibition on modification of loans secured by a debtor's principal residence. Additionally, One West objected to the valuation assigned by Benafel to the Property in the Original Plan. Finally, One West argued that, regardless of the current value of the Property, the proper amount of its secured claim was the total of the unpaid principal due on the loan on the petition date, $301,500, plus accumulated interest and fees of $25,003.88.

The bankruptcy court conducted a hearing on confirmation of the Original Plan on November 9, 2010. After hearing testimony about the value of the Property, the court ruled that the Original Plan could not be confirmed. As the court observed, and the parties acknowledged, confirmation of the Original Plan was premised on Benafel's ability to cram down the One West claim secured by the Property. Though Benafel was not residing at the Property on the date the bankruptcy petition was filed, the bankruptcy court noted that it had previously ruled that, "the appropriate time to look to ascertain the status of the loan under

-4-

[§ 1322(b)(2)] is the time the borrower borrowed the money and granted the security interest to the secured creditor." Hr'g Tr. 51:21-25, November 9, 2010. The court indicated its intent to adhere to the rule announced in its prior decision and offered two reasons for adopting the loan transaction date for application of § 1322(b)(2).

First, referring to the concurrence of Justice Stevens in Nobleman v. Am. Sav. Bank, 508 U.S. 324 (1993), the bankruptcy court observed that,

> Congress enacted [§ 1322(b)(2)] to encourage the flow of capital into housing. . . . It follows logically that the whole purpose of the anti-cramdown provision is to encourage lenders to make loans. They could only make the loan in light of the circumstances that exist at the time the property is acquired and for that reason they have to be able to rely on the anti-cramdown provision not only at the time, but throughout the lifetime of the loan.
>
> If the court were to adopt the [petition date as determinative of the date of principal residency for § 1322(b)(2) purposes], the purpose of the provision would be suborned. Debtors could buy a house one year, move away from it another, file their bankruptcy the third, and claim a right to cramdown notwithstanding the fact that the creditor was relying on a provision Congress intended to protect it for the lifetime of the loan.

Hr'g Tr. 52:16—53:6.

Second, responding to Benafel's argument that the lender had waived its right to assert its status under § 1322(b)(2) by the term in the Note that Benafel was only obligated to reside at the Property for one year, the bankruptcy court ruled that, to be effective, any waiver of the lender's rights had to be explicit and knowing, and the court could not make such a finding based merely on the Note.

On December 22, 2010, the bankruptcy court entered an order

denying confirmation of the Original Plan, without prejudice to Benafel's submission of a plan without the One West cram down provision (the "Denial Order"). At the same time, the court entered a Memorandum of Decision explaining its reasons for denying confirmation of the Original Plan. The court's analysis in the decision is generally consistent with its comments on the record at the hearing on December 10, 2010. In particular, the court provided an extended explanation of its response to Benafel's argument that the lender had waived its right to assert its status under § 1322(b)(2) by the language in the Note that Benafel was only obligated to reside at the Property for one year. After a discussion of the case law, the bankruptcy court wrote, consistently with its earlier remarks, that "whatever the parties' intentions, the Court may not find that the language operates as a waiver of the lender's protections under Code § 1322(b)(2) unless the contractual language is explicit to that effect, and reflects a knowing and purposeful waiver of the bank's rights under the Bankruptcy Code." In re Benafel, 2010 WL 5373127, at *2 (Bankr. D. Or. December 22, 2010). Benafel filed a timely appeal of the Denial Order on January 4, 2011.

Earlier, on December 10, 2010, Benafel had filed a Preconfirmation Amendment of Plan (the "Amended Plan"). The Amended Plan provided for payments to the trustee of $552 per month for sixty months, including $417 per month to cure estimated arrearages on the debt to One West, and that Benafel would pay directly to One West "the regular payment due postpetition on these claims." In other words, the Amended Plan abandoned the cram down request.

-6-

On February 11, 2011, the bankruptcy court entered an order confirming the Amended Plan. Benafel filed a timely appeal of the confirmation order on February 22, 2011. The Panel consolidated these appeals on March 2, 2011.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

What is the appropriate date for determining whether a claim is secured by a debtor's principal residence for purposes of § 1322(b)(2)?

**STANDARD OF REVIEW**

This appeal requires the Panel to review the bankruptcy court's interpretation of § 1322(b)(2). We review the bankruptcy court's construction of the Bankruptcy Code de novo. Educ. Credit Mgmt. Corp. v. Mason (In re Mason), 464 F.3d 878, 881 (9th Cir. 2006); W. States Glass Corp. v. Barris (In re Bay Area Glass, Inc.), 454 B.R. 86, 88 (9th Cir. BAP 2011).

**DISCUSSION**

I.

The bankruptcy court entered its orders denying confirmation of the Original Plan, and confirming the Amended Plan, based upon its interpretation of § 1322(b)(2) that whether a claim is secured by a debtor's principal residence is determined as of the loan transaction date, rather than the bankruptcy petition date. Under the facts, the bankruptcy court determined that Benafel's Original Plan violated § 1322(b)(2), and that Benafel could not modify or, in the bankruptcy vernacular "cram down," One West's secured

-7-

claim.

After briefing by the parties in this appeal was completed, a three-judge panel of this BAP issued a published Opinion holding that "the appropriate time for determining whether property is a debtor's principal residence is the petition date." BAC Home Loans Serv., LP v. Abdelgadir (In re Abdelgadir), 455 B.R. 896, 898 (9th Cir BAP 2011).[3] Although Abdelgadir was a chapter 11 case, and the Panel's Opinion construed § 1123(b)(5) rather than § 1322(b)(2), the material provisions of these two Code provisions are identical.[4] While the issues presented involve different Code provisions, because the Panel's analysis in Abdelgadir is highly

---

[3] The decision of the bankruptcy court underlying the Abdelgadir appeal was not published. All quotations from that bankruptcy court presented in this Opinion were taken from the Panel's Abdelgadir opinion.

[4] Compare:

(b) Subject to subsection (a) of this section, a plan may– . . . (5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

§ 1123(b)(5)

with:

(b) Subject to subsections (a) and (c) of this section, the plan may--(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

§ 1322(b)(2).

Note: The restrictions under § 1123(a) and § 1322(a)and (c) are not relevant here.

-8-

persuasive, we adopt the rule announced in Abdelgadir to resolve the issue in this chapter 13 appeal.

In Abdelgadir, the debtors originally filed a bankruptcy petition under chapter 13. In their petition and schedules, the Abdelgadirs listed a home address in Las Vegas (the "Las Vegas Property"). The Las Vegas Property was encumbered by first and second deeds of trust. According to the security instruments, the Abdelgadirs were required to occupy the Las Vegas Property as a "primary year-round residence."

The Abdelgadirs later moved to convert their case to chapter 11, a motion the bankruptcy court granted. Then they filed a notice with the bankruptcy court, changing their address to a different location, and leased the Las Vegas Property to a third party.

The Abdelgadirs filed a chapter 11 plan on March 9, 2010, in which they proposed to modify the terms of the loan secured by the first mortgage on the Las Vegas Property. According to the plan, at that time, the Las Vegas Property was no longer their residence, but was now an investment property, and therefore, modification of the terms of the loan secured by the Las Vegas Property was no longer barred under of § 1123(b)(5). They argued that whether the Las Vegas Property was their principal residence for purposes of § 1123(b)(5) was a determination that should be made by the bankruptcy court as of the time of plan confirmation.

The creditor holding the deed of trust on the Las Vegas Property objected to the plan and argued that whether the Las Vegas Property was the Abdelgadirs' principal residence must be determined by the bankruptcy court at the time the lender was

-9-

granted its security interest in the collateral, or alternatively, on the petition date, but not on the date of plan confirmation.

After conducting evidentiary hearings, the bankruptcy court agreed with the Abdelgadirs that the time to determine whether the Las Vegas Property was their principal residence was at plan confirmation. The bankruptcy court reasoned that "this whole process involves valuing. And we know from the [Bankruptcy] [C]ode that you value in connection with what you're doing, and we know that you value a plan, creditor's rights, as of the effective date which then refers to confirmation." In re Abdelgadir, 455 B.R. at 902.

The secured creditor appealed the bankruptcy court's order confirming the Abdelgadirs' chapter 11 plan. The issue on appeal, as framed by the Panel, was, "[w]hat is the determinative date for whether a claim is secured by a debtor's principal residence subject to the Bankruptcy Code's anti-modification provision?" Id. at 900.

In Abdelgadir, as an initial observation, the Panel noted that while there was little case law discussing the anti-modification rule in § 1123(b)(5),

> [t]he language of § 1123(b)(5) is identical to that of § 1322(b)(2) and was added to the Bankruptcy Code in 1994 to harmonize the treatment of home mortgage loans in chapter 11 and chapter 13. See Granite Bank v. Cohen (In re Cohen), 267 B.R. 39, 42 (Bankr. D.N.H. 2001); Lomas Mortg., Inc. v. Louis, 82 F.3d 1, 6 (1st Cir. 1996) (citing legislative history). Therefore, case law that examines § 1322(b)(2) is persuasive in our analysis of § 1123(b)(5).

Id. at 900, n.7.

The Panel perhaps understated the problem of a lack of decisional law addressing the proper construction of § 1123(b)(5).

-10-

Of the nine cases cited by the Panel concerning the anti-modification clauses in the Bankruptcy Code, eight were chapter 13 cases analyzing § 1322(b)(2).[5] The ninth case, In re Cohen, was a chapter 11 case addressing § 1123(b)(5), but all the cases Cohen cited and analyzed regarding the anti-modification rule were § 1322(b)(2) cases.

While Abdelgadir relied almost exclusively on chapter 13 cases interpreting § 1322(b)(2) in construing the anti-modification rule in § 1123(b)(5), we find no error in that approach. Both provisions of the Code provide special plan treatment protections for home loans in the bankruptcy cases of individual debtors. As the Cohen bankruptcy court observed, "Congress intended to amend Chapter 11 of the Bankruptcy Code to include the same anti-modification provision applicable to Chapter 13 plans under section 1322(b)(2)." In re Cohen, 267 B.R. at 42; see H.R. Rep. No. 835 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3354 ("This amendment conforms the treatment of residential mortgages in chapter 11 to that in chapter 13, preventing the modification of the rights of a holder of a claim secured only by a security interest in the debtor's principal residence."); see also Lievsay v. W. Fin. Sav. Bank, F.S.B. (In re Lievsay), 199 B.R. 705, 708 (9th Cir. BAP 1996) (Although Lievsay was a chapter

---

[5] Nobelman v. Am. Sav. Bank, 508 U.S. 324, 331 (1993); Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough), 461 F.3d 406, 411 (3d Cir. 2006); Zimmer v. PSB Lending Corp. (In re Zimmer), 313 F.3d 1220, 1223, 1226-27 (9th Cir. 2002); Lomas Mortg., Inc. v. Louis, 82 F.3d 1, 6 (1st Cir. 1996); Dean v. LaPlaya Inv., Inc. (In re Dean), 319 B.R. 474, 478-79 (Bankr. E.D. Va. 2004); Crain v. PSB Lending Corp. (In re Crain), 243 B.R. 75, 83 (Bankr. C.D. Cal. 1999); In re Smart, 214 B.R. 63 (Bankr. D. Conn. 1997); In re Wetherbee, 164 B.R. 212, 215 (Bankr. D.N.H. 1994).

-11-

11 case, it ruled that "[g]iven the congressional intent to harmonize the two chapters' treatment of home mortgages, and the nearly identical language of the two sections, we will use [§ 1322(b)(2)] cases to guide us[.]").  Thus, even though the Abdelgadir opinion dealt with the anti-modification rule under § 1123(b)(5), the Panel's analysis was based on cases and reasoning construing the anti-modification rule in § 1322(b)(2).  We therefore confidently regard Abdelgadir as highly persuasive in resolving the issue in the current appeal.

Moving to the merits, the Abdelgadir Panel examined what it believed was the plain meaning of § 1123(b)(5).  The Panel reasoned that, by its plain language, § 1123(b)(5) allows a debtor to modify the rights of creditors holding certain claims - secured claims and unsecured claims – but prohibits the modification of the rights of creditors holding claims secured by a debtor's principal residence.  Id. at 901.

The Panel then engaged in a discussion of the meaning of "claim" in the Bankruptcy Code, and why the bankruptcy court erred in using the plan confirmation date as determinative of principal residence for purposes of the anti-modification rule.  As the Panel explained, "claim" is a defined term under the Bankruptcy Code. § 101(5) (A claim is a "right to payment, whether . . . secured, or unsecured.").  It noted that whether a claim is secured or unsecured is determined by application of § 506(a).  However, the Panel observed, a claim is deemed allowed when a creditor files a proof of claim in the bankruptcy case, and the Code requires that the amount of that claim be fixed as of the date of filing a bankruptcy petition.  Id.

-12-

The Abdelgadir bankruptcy court had explained that its decision to use the plan confirmation date for determining whether § 1123(b)(5)'s anti-modification rule applied to the secured creditor's claim was because "this whole process involves valuing. And we know from the [Bankruptcy] [C]ode that you value in connection with what you're doing, and we know that you value a plan, creditor's rights, as of the effective date which then refers to confirmation." Id. at 902. However, in Abdelgadir, the Panel concluded that, even though the bankruptcy court's rationale for valuing the secured creditor's claim at confirmation was a correct one, its interpretation of § 1123(b)(5) as measuring whether a claim is protected from modification at the date of plan confirmation was flawed. It reasoned that the bankruptcy court's approach improperly shifted the time for fixing a creditor's claim from the petition date to some future valuation date and conflated the analysis of whether a creditor held a claim secured by the debtor's principal residence with a determination of the value of that claim. In reaching its conclusion, the Panel relied on the several § 1322(b)(2) decisions mentioned above, including In re Crain, 243 B.R. at 83-34 (valuation, not existence, of claim determined at plan confirmation); In re Dean, 319 B.R. at 478-79 (court does not have to wait for confirmation to determine principal residence for anti-modification purposes).

In its review of the bankruptcy court's ruling, Abdelgadir also addressed and rejected the "last antecedent" argument offered by the debtors in that case, and by Benafel here. In particular, the Panel acknowledged that some bankruptcy courts, including In re Smart, 214 B.R. at 63, have reasoned that the phrase "real

-13-

property that is the debtor's principal residence" in §§ 1123(b)(5) and 1322(b)(2) is intended to modify the term "security interest." As a result, the courts concluded that the phrase, "security interest in real property that is the debtor's principal residence" is ambiguous (i.e., it could refer to the debtor's home at the present time, the petition date, or when the security interest was created). Those courts therefore consulted the Code's legislative history to resolve the ambiguity, and in particular, noted Justice Stevens' concurrence in Nobleman, where Justice Stevens suggests that the legislative history shows that the purpose of the anti-modification clause was to provide favorable treatment of home mortgages in order to encourage capital into the home lending market. See 508 U.S. at 332. In order to align with that purpose, those courts concluded that the appropriate reference date for determining if a property is a principal residence of the debtor is the date that the security interest was created. See In re Smart, 214 B.R. at 68.[6]

The Abdelgadir Panel noted the case of Milavetz, Gallop & Milavetz, P.A. v. United States, 130 S.Ct 1324, 1332 (2010), which is the most recent statement of the U.S. Supreme Court regarding interpretation of the Code. "Reliance on legislative history is unnecessary in light of the statute's unambiguous language." Milavetz, Gallop & Milavetz, P.A. v. United States, 130 S.Ct. at 1332 n.3. According to the Panel, because the plain language of §

---

[6] In its Memorandum of Decision, the bankruptcy court seemed to approve In re Smart's reliance on the last antecedent argument to support the Smart court's conclusion that a debtor's principal residence is determined at the loan transaction date. In re Benafel, 2010 WL 5373127, at *2. That argument was rejected by the Abdelgadir Panel.

-14-

1123(b)(5) excepts a particular type of claim from modification in a debtor's plan, the creditor's right to payment is fixed at the petition date. §§ 101(5), 502; In re Dean, 319 B.R. at 478. Therefore, the Panel concluded, "the determinative date for whether a claim is secured by a debtor's principal residence is, like all claims, fixed at the petition date." In re Abdelgadir, 455 B.R. at 903.

Because the statutes under scrutiny in Abdelgadir and in this appeal are different, that decision does not technically control the outcome here. Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001)("In determining whether it is bound by an earlier decision, the court considers not merely 'the reason and spirit of cases' but also 'the letter of particular precedents.'. . . [T]he precise language employed is often crucial to the contours and scope of the rule announced." (quoting Fisher v. Prince, 97 Eng. Rep. 876, 876 (K.B. 1762)). Even so, because the Abdelgadir Panel's analysis of § 1123(b)(5)'s anti-modification rule was informed almost exclusively by the decisional law construing the identical language of § 1322(b)(2), the Panel's opinion in Abdelgadir must be regarded as highly persuasive that § 1322(b)(2)'s anti-modification rule is also fixed on the petition date. In deference to Abdelgadir, and because there would be no honest basis to engage in a different analysis in this appeal, we conclude that the bankruptcy court's decision in this appeal that the loan transaction date determines principal residence for § 1322(b)(2)'s purposes must be reversed.[7]

_____

[7] We acknowledge that the Abdelgadir decision has been appealed to the Ninth Circuit, Case No. 11-60061. However, since
(continued...)

-15-

II.

Even if we did not look to the Panel's opinion in <u>Abdelgadir</u> to determine the outcome of the issue in this appeal, the majority of other cases and authorities interpreting § 1322(b)(2) have concluded that the petition date should be used in determining the debtor's principal residence for purposes of that statute.

One popular treatise on Chapter 13 observes that "[u]ntil recently, a majority of the reported decisions concluded that entitlement to the protection from modification in § 1322(b)(2) is determined based on circumstances at the petition." Keith M. Lunden & William H. Brown, CHAPTER 13 BANKRUPTCY, 4th ed. § 121.2, Sec. Rev. April 11, 2011, www.ch13online.com. On the other hand, the authors suggest that the trend in recent cases may favor the view that the status of a debtor's property should be made at the time of the loan origination.[8]

In contrast, another respected treatise, <u>Colliers</u>, posits that a 2010 technical amendment to the Bankruptcy Code adding to the definition of "debtor's principal residence" the requirement that the structure be "used as the principal residence by the debtor" may imply a present use by the debtor, thus favoring the

[7](...continued)
we do not consider <u>Abdelgadir</u> to be binding on this Panel, that the rule its announces might be modified, or even rejected, by the Court of Appeals does not dictate whether we should find the <u>Abdelgadir</u> analysis persuasive at this time.

[8] The statement that there is a "trend" favoring the loan transaction date is somewhat puzzling because the treatise cites to fewer cases decided in the last eleven years to support that statement than it cites supporting use of the petition date. The most recent addition to the list favoring the loan transaction date is the bankruptcy court's decision in <u>In re Abdelgadir</u>, which the Panel reversed in favor of the petition date. <u>In re Abdelgadir</u>, 455 B.R. at 903.

-16-

petition date rather than the loan transaction date. 8 COLLIER ON BANKRUPTCY §1322.06[1][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011); compare § 101(13A)(repealed 2010) ("The term 'debtor's principal residence' — (A) means a residential structure, including incidental property, without regard to whether that structure is attached to real property; and (B) includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer.") with § 101(13A) (2010) (The term 'debtor's principal residence' — (A) means a residential structure if used as the principal residence by the debtor, including incidental property, without regard to whether that structure is attached to real property; and (B) includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer if used as the principal residence by the debtor.) (emphasis added).

Regardless of recent "trends" in case law and commentary, however, we find that the majority of the cases interpreting § 1322(b)(2) favor use of the petition date to determine principal residence. For example, in In re Christopherson, 446 B.R. 831, 835 (Bankr. N.D. Ohio 2011), the bankruptcy court reasoned that, "[t]he majority of courts has determined that the critical date is the petition filing date. . . . . A minority of courts hold that a debtor's [principal] residence is determined at the time the security interest was created. . . . The minority position requires a subjective look into the parties intentions which is difficult to ascertain after the fact, and could lead to inconsistent rulings." The court decided to "follow[] the majority view that a bright line rule should be applied."

Another recent Ohio case held that the petition date was preferred, because "failure to consider the petition date could lead to creditor manipulation." In re Baker, 398 B.R. 198, 203 (Bankr. N.D. Ohio 2008).

In Wells Fargo Bank, N.A. v. Jordan (In re Jordan), 330 B.R. 857, 860 (Bankr. M.D. Ga. 2005) the bankruptcy court held that, "The law in this district is that the critical date for deciding whether a creditor qualifies for section 1322(b)(2) protection is the date the petition is filed." (Internal quotation marks omitted.) The petition date has also been applied in the District of Massachusetts, In re Leigh, 307 B.R. 324, 331 (Bankr. D. Mass. 2004); the Eastern District of Missouri, In re Bosch, 287 B.R. 222, 226 (Bankr. E.D. Mo. 2002); the District of New Hampshire, In re Schultz, 2001 Bankr. LEXIS 1319 (Bankr. D.N.H. 2001); and the Northern District of Illinois, In re Larios, 259 B.R. 675 (Bankr. N.D. Ill. 2001).

Moreover, a significant majority of cases decided before 2000 also held that the petition date determines principal residence for purposes of the anti-modification rule in §1322(b). 2 K. Lunden, CHAPTER 13 BANKRUPTCY § 121.2 at 121-3 – 121-9 (3d ed. 2000)); see In re Donahue, 221 B.R. 105, 111 (Bankr. D.Vt. 1998) ("A determination as to when Debtor's property is his [principal] residence for purposes of § 1322(b)(2) is made at the commencement of the case"); In re Howard, 220 B.R. 716, 718 (Bankr. S.D. Ga. 1998) (The court must determine whether security interest is protected from modification by § 1322(b)(2) with reference to the date of the Chapter 13 petition and the language of the security instrument without regard to whether collateral described in the

-18-

agreement continues to exist or has any value); In re Lebrun, 185 B.R. 665 (Bankr. D. Mass. 1995)(observing that, at the time of the loan origination, the debtor occupied the real estate collateral, but had rented it out on the petition date. The court held that § 1322(b)(2) did not protect the mortgage from modification.); In re Wetherbee, 164 B.R. 212, 215 (Bankr. D. N.H. 1994) ("A 'claim' is a term of art in a bankruptcy proceeding which defines a creditor's right of payment in the bankruptcy proceeding. A 'claim' in bankruptcy arises on the date of the filing of the petition. Therefore, only if a claim is secured by the debtor's principal residence at the time of the bankruptcy petition is the debtor prohibited from modifying the creditor's interest under the plain language of [§ 1322(b)(2)]."); In re Churchill, 150 B.R. 288, 289 (Bankr. D. Me. 1993) (That the debtor's real property was not her principal residence at the time of the loan transaction does not defeat the protection from modification in § 1322(b)(2) where the property was the debtor's principal residence at the time of filing of the Chapter 13 case.); see also (for the proposition that the petition date controls), In re Boisvert, 156 B.R. 357, 359 (Bankr. D. Mass. 1993); In re Dinsmore, 141 B.R. 499, 505-06 (Bankr. W.D. Mich. 1992); In re Amerson, 143 B.R. 413, 416 (Bankr. S.D. Miss. 1992); In re Groff, 131 B.R. 703, 706 (Bankr. E.D. Wis. 1991).

In numbers, the courts that rely upon the loan transaction date for determining a chapter 13 debtor's principal residence amount to a distinct minority. The Third Circuit has held that "the critical moment [for purposes of § 1322(b)(2)] is when the creditor takes a security interest in the collateral. . . . [W]e

-19-

look to the character of the collateral at the time of the mortgage transaction." Scarborough v. Chase Manhattan Corp. (In re Scarborough), 461 F.3d 406 (3d Cir. 2006). One First Circuit BAP decision looked to the loan transaction date as the reference date for determining application of the anti-modification clause. However, in that case, the panel's stated motivation was to use the date resulting in the most favorable treatment for the debtor under the circumstances, and not as the result of adoption of any generally applicable rule. GMAC Mortg. Corp. v. Marenaro (In re Marenaro), 217 B.R. 358, 360 (1st Cir BAP 1998). Other cases favoring use of the loan transaction date are: In re Smart, 214 B.R. 63, 67 (Bankr. D. Conn. 1997) (bankruptcy court held that the appropriate reference date is the date the security interest was created rather than the date the petition was filed); Parker v. Fed. Home Loan Mortg. Corp., 179 B.R. 492, 494 (E.D. La. 1995) (same); In re Hildebran, 54 B.R. 585, 586 (Bankr. D. Or. 1985) (same, and a case cited by the bankruptcy court in this appeal in support of its position favoring the loan transaction date).

It may be ironic in the current appeal, where One West argues in favor of using the loan transaction date, that some cases aligning with One West's position did not result in a desirable outcome for the secured creditor. For example, in In re Roemer, a provision in the loan documents limited the debtor's obligation to remain in the house securing the loan for one year. The bankruptcy court ruled that this provision "limited its anti-modification protection to at most one year (and arguably [the secured creditor] was not entitled to anti-modification protection

-20-

at all.)." 421 B.R. 23, 26 (Bankr. D.D.C. 2009).[9]

Based upon our survey of the case law, we conclude that the use of the petition date for determining the anti-modification provision of § 1322(b)(2) is the clear majority rule. When this is taken together with the Panel's holding in In re Abdelgadir that the petition date is the appropriate date for determining debtor's principal residence for purposes of § 1123(b)(5), we conclude that the bankruptcy court erred in fixing the loan transaction date as the appropriate date for that determination.[10]

## III.

While the Panel's Abdelgadir decision was published after briefing had been completed in this appeal, in an order issued before oral argument in this appeal, the Panel instructed counsel for the parties to be prepared to discuss the implications of the Abdelgadir decision for this appeal. At argument, One West raised two points in its analysis of Abdelgadir we should address.

One West argued that the Abdelgadir Panel erred in equating §§ 1322(b)(2) and 1123(b)(5) because, in context, the provisions should be distinguished. In particular, counsel for One West

[9] Of course, other decisions have held that where the loan transaction documents contemplate some commercial use by the debtor of the subject property, the anti-modification rule may not apply. Bank of the Prairie v. Picht (In re Picht), 428 B.R. 885, 888 (10th Cir. BAP 2010); In re Moore, 441 B.R. 732 (Bankr. N.D.N.Y. 2010); In re Grimes, 2009 WL 960143 (Bankr. D. Or. 2009). The issue here, though, does not involve whether Benafel used the Property as something other than her principal residence, but rather, the relevant date to be used by the bankruptcy court in asking that question.

[10] Under the circumstances, we find it unnecessary to include a detailed analysis of the various arguments advanced by parties and discussed by courts in reaching their decisions.

-21-

noted that § 1322(b)(3), (5) and (c)(1) and (2), provisions which directly or indirectly affect the anti-modification rule in § 1322(b)(2), do not appear in § 1123. Therefore, One West contends, we should consider a different approach in interpreting § 1322(b)(2) than the construction given § 1123(b)(5) in Abdelgadir. We disagree.

None of the other chapter 13 provisions cited by One West relate to the date to be used to determine a debtor's principal residence. Subsections 1322(b)(3),(b)(5) and (c)(1) all deal with curing defaults; subsection 1322(c)(2) provides an exception to (b)(2) in that, if the last payment on the original payment schedule for a mortgage is due before the final plan payment, the debtor may pay the claim as modified pursuant to § 1325(a)(5). As a result, these four provisions are equally applicable whether the debtor's principal residence is fixed as of the loan transaction date or the petition date. Moreover, these provisions have been part of the Bankruptcy Code since 1994, and presumably the bankruptcy courts that have adopted the petition date for applying § 1322(b)(2) were aware of their existence, but were unpersuaded that these other provisions added anything to the required analysis. In short, to the extent that One West argues that § 1322(b)(2) should be interpreted differently than § 1123(b)(5) because of these other subsections, it is a distinction without a difference.

One West's second argument was that, even if Abdelgadir's ruling that the petition date controls is correct, the facts of this case would support a conclusion that the Property was Benafel's principal residence on the petition date. One West

-22-

noted that Benafel left the Property and leased it only shortly before filing for bankruptcy.  Even though Benafel was not living at the Property on the petition date, One West suggests that she may have intended to return to live there later.  If so, the bankruptcy court could have determined that the Property was Benafel's domicile, and consequently deemed the Property to be her principal residence for § 1322(b)(2) purposes.

Regarding this point, the bankruptcy court observed that:

The parties agree that the [Property] is not the Debtor's principal residence, and was not as of the petition date.  It was, however, her principal residence at the time the existing loan was obtained, and the security interest in the property granted.

In re Benafel, 2010 WL 5373127, at *1 (Bankr. D. Or. December 22, 2010).  Upon closer examination of the record, however, One West is correct that there is no indication that the parties had agreed, or that either party had even contended, that the Property was, or was not, Benafel's principal residence on the petition date.  Instead, the bankruptcy court's "finding" in its decision was likely based on an opening colloquy between the court and counsel for One West:

THE COURT: I understand you're agreeing that [at] the time [] the loan was taken out, that Ms. Benafel lived in the subject property, but that she did not live there at the time the petition was filed.

MILLS [attorney for One West]: I believe that's an accurate representation of the facts, Your Honor.

Hr'g Tr. 4:11-15.  Counsel for Benafel did not attempt to correct the court's statement.  But as can be seen, at best, this was a concession by One West about Benafel's living arrangements, not technically whether the Property was her principal residence on either the loan transaction or petition date.

-23-

Any such error by the bankruptcy court is of no consequence to this appeal. On remand, One West is free to argue that, as a matter of fact, while Benafel was living with her mother on the petition date, the Property nonetheless should be found by the bankruptcy court to have constituted her "principal residence." We express no opinion concerning the outcome of that issue. Our holding here is limited to resolving the legal issue raised by this appeal involving the relevant date for determining whether the Property was, or was not, Benafel's principal residence on the petition date.

## CONCLUSION

We REVERSE the orders of the bankruptcy court and REMAND this case to the bankruptcy court for further proceedings consistent with this Opinion.

-24-